**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-376 (RDM)** |
| **v.** | : | |
| | : | |
| **RYAN SETH SULESKI,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant, Ryan Seth Suleski, to 90 days of incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution.

## I.    Introduction

Defendant Ryan Seth Suleski is a 34-year-old Federal Firearms Licensed dealer ("FFL") and long-haul truck driver who earned a Bad Conduct discharge from the U.S. Army.  On January 6, 2021, he participated in the attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on July 6, 2022, (ECF No. 40 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Suleski pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(1), unlawful entry into a restricted facility, and one count of violating 18 U.S.C. § 641, theft of government property. As explained herein, a sentence of incarceration is appropriate in this case because Suleski, despite observing and experiencing the police using chemical agents and rubber bullets to keep rioters at bay, entered the Capitol Building through the Upper West Terrace door just two minutes after the first rioters breached that door.  While inside, Suleski watched and video recorded with his mobile telephone as rioters inside confronted the police blocking the Rotunda doors on the east front of the Capitol, keeping the outside rioters from entering.  That was one of the most violent breaches that day.

Suleski then wandered the hallways around the House Gallery with other rioters and attempted to open closed and locked doors, before ultimately rifling through and stealing papers from outside an office.  This was exceedingly aggravating conduct, as Congressional staffers and other employees, many of whom were terrified they would be attacked by the rioters, were sheltering inside their offices throughout the riot. *See* https://rollcall.com/2021/01/28/insurrection-aftermath-staffers-struggle-with-trauma-guilt-and-fear/.  That trauma continued for some of those persons for many months. *See* https://rollcall.com/2022/01/06/for-many-capitol-hill-staffers-the-trauma-of-jan-6-has-never-left/.  Plainly, if anyone was inside any of the rooms whose door Suleski attempted to open, that would have substantially increased their fear.

Suleski exited the building approximately fifteen minutes later. Still on the Capitol Grounds, with the Capitol Building in the background, Suleski gave an interview to a BBC reporter, saying "This nation wasn't founded on civility. This nation was founded on revolutionary activity. We became civil after the government realized that they got overwhelmed."  When the reporter asked him what came next, Suleski responded in militaristic terms that suggested a future

readiness for violence saying, "I guess now we wait and see if they take us seriously because they saw how easily we were able to breach their defense."  Finally, when interviewed by the FBI prior to his arrest, Suleski not only lied about the violence that he saw and about taking any papers from the building, he also actively concealed his cell phone from law enforcement officials, despite a search and seizure warrant for the phone.

The Court must also consider that Suleski's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings.  *See United States v. Thomas Fee*, 1:21-cr-00131 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country.  I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates).  Suleski's actions and those of his fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators, and their staffs, and disrupted the certification vote for several hours.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  Here, the facts of and circumstances of Suleski's crime support a sentence of 90 days of incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 40 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day.

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against police on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.  Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk.  The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd

already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.  By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.  They flooded the area labeled "Lower West Plaza" Area C on Government's Exhibit 1, pushing against the barricade there.



*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.  For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).  In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.  At 2:03 pm, Metropolitan Police Department ("MPD") officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.  It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately.  This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.  On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were no manned-defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.

With this backdrop we turn to Suleski's conduct and behavior on January 6.





*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### Suleski's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Suleski traveled to Washington, D.C., by automobile from his home in the Norfolk, Virginia area.  The purpose of Suleski's trip to Washington, D.C., was to attend President Trump's rally at the Ellipse.  According to Suleski, approximately halfway through the rally, he recalled that January 6th was the date Congress certified the election results. Remembering that protestors had been permitted into the Capitol during previous Supreme Court

nomination proceedings, Suleski decided to walk to the Capitol to see if anyone would be permitted inside.

Upon arrival at the West Lawn, Suleski observed a huge crowd, saw barricades, was admittedly struck with tear gas, and watched as police shot rubber projectiles into the crowd.[2] Suleski was present on the West Lawn as MPD broadcast the dispersal orders.



*Exhibit 5: Suleski as part of the crowd on the West Lawn*

Capitol Building surveillance video captured Suleski entering the building at 2:35 pm, as depicted in Exhibit 6 below.  That means he was present in the mob that battled with and overwhelmed USCP and MPD officers. [3]  When the police line was breached, and the officers were forced to retreat, the rioters rushed up the stairs of the Capitol Building.  Undeterred by the violence surrounding him, Suleski followed the mob up the stairs, arriving at the Upper West Terrace and entering the building through the Upper West Terrace door just twenty minutes after the first breach of the Capitol building, and just two minutes after the first rioters entered the Upper West Terrace Door at 2:33 pm.  As he entered the doors, high-pitched security alarms continuously sounded.

---

[2]  Suleski claimed that he was hit by a rubber bullet and kept it as a souvenir.
[3]  The government does not currently have any information that Suleski participated in an assault on any law enforcement officers.



*Exhibit 6: Suleski entering through the doors of the Upper West Terrace at 2:35 pm.  The stairs leading to the Rotunda are visible in the bottom photo.*

Once inside, Suleski climbed the stairs that lead to the Rotunda and the second floor with a large group of rioters.  While there, he stopped at the Rotunda Doors, also referred to as the Columbus Doors, to take video on his mobile telephone of the rioters outside the building who were pushing and yelling, attempting to breach the door, while the rioters inside were confronting the police guarding that door, yelling "open the doors" at the officers.  Suleski then made his way to the House Gallery Steps at 2:37 pm, as shown in Exhibit 7, below, and climbed to the third floor.  Two minutes later, at 2:39 pm, Members inside the House Chamber began to evacuate.



*Exhibit 7: Suleski climbing the House Gallery steps.*

Once on the third floor, Suleski walked through hallways with closed and locked doors that he attempted to open.  At one point, he met another rioter and they walked together through a hallway of offices near the House Gallery.



*Exhibit 8: Suleski and another rioter in the East Corridor near the House Gallery*

The other rioter attempted to open a closed door while Suleski watched.  Suleski then walked to another closed office door (the door to the far right of Exhibit 8 above) and appeared to

kick it.  Neither door opened.  A few minutes later, Suleski joined two other rioters and walked through the hallways surrounding the House Gallery.  Offices and cabinets lined these hallways, most with closed doors.  Suleski watched as other rioters attempted to open those doors.  Suleski himself spent fifteen seconds outside one door while the other rioters walked down the hallway.[4] Due to the angle of the video, it is unclear what Suleski did at that door, but the movement of his body and the length of time he spent at the door suggests that he attempted to manipulate it.[5]

Moments later, the trio walked all the way to the end of the hallway, near the House Radio-TV Gallery, where there were papers laying on the ground.



*Exhibit 9: Suleski and two other rioters walk through the House Gallery West hallway; this hallway includes the House Appropriations Committee's Republican minority office.*

Upon reaching the end of the hallway, at about 2:43 pm, Suleski and one of the other individuals picked up some of the papers and looked at them.  The other individual dropped the papers back to the ground, but Suleski kept the papers he had picked up, rolled them up, and started to secret them inside his jacket.

---

[4]  Based on the camera location, this appears to be a door that leads directly to the House Gallery.
[5]  Suleski admitted that he attempted to open closed doors.  *See* ECF No. 40 at ¶ 10.



*Exhibit 10: Suleski in House Gallery West hallway with rolled up papers he took from the ground.*

Suleski then changed his mind, took off his backpack, and placed the papers inside the backpack.[6]



*Exhibit 11: Suleski in House Gallery West hallway placing rolled up papers into his backpack.*

He returned the backpack back to his shoulders and continued to walk through the Capitol building.

About three minutes later, at 2:46 pm, Suleski traveled back to the first floor, walked through the

Hall of Columns, and exited the building through the south door of the building.

### Social Media Posts

After leaving the Capitol, but while still on the Capitol grounds, Suleski gave an interview

to a BBC reporter.  With the Capitol building in the background, and with rioters moving freely

---

[6]  Despite multiple inquiries with Capitol Staff, the government has been unable to identify the
papers taken.  Suleski admitted that they were Congressional papers.  *See* ECF No. 40 at ¶ 14.

around him, the BBC reporter stated to Suleski, referring to the events of the day, "That is just not how things are done in this country." Suleski responded, "Right." The reporter went on to say, "Lawlessness, storming buildings, even, and that is what happened today." Suleski countered, "This nation wasn't founded on civility. This nation was founded on revolutionary activity. We became civil after the government realized that they got overwhelmed." The reporter asked Suleski, "So, what happens now?" Suleski answered, "I guess now we wait and see if they take us seriously because they saw how easily we were able to breach their defense."



*Exhibit 12*

Suleski posted this video to his publicly available TikTok account.[7]

Driving home from the January 6 riots, Suleski recorded a video on his mobile telephone in which he spoke to the camera and discussed the events of the day; he posted this video to his publicly available TikTok account soon thereafter.  Suleski began his monologue by saying, "So, I'm pretty sure everybody's been watching the news about what happened in Washington, D.C. today."



*Exhibit 13*

He went on to report that he was in the "initial wave of people that forced our way into the Capitol building."  Suleski went on to say that he "got tear gas grenaded," "got a CS gas canister dropped on" him, and "got hit with some rubber bullets."  He concluded with, "today was fucking nuts.

---

[7]  According to Suleski, TikTok removed his account after he posted this video.

But we got our point across.  We showed how weak their defense was.  And we showed Congress that America is tired of being fucking quiet and that we're about that life."

### *Suleski's Pre-Arrest Interview*

Prior to his arrest, Suleski agreed to speak with the FBI.  On January 18, 2021, FBI agents interviewed him at his residence.  During this interview, Suleski generally admitted to being inside the Capitol on January 6, 2021, but also minimized his actions.  He claimed that after his initial arrival at the Capitol he did not see any barriers or knowingly cross them and believed the crowd ahead of him must have moved them before he arrived.  Suleski also stated that he went up the stairs to the Capitol and was taking pictures of the area when he realized that people were going into the Capitol building; he decided to follow and entered the Capitol building through the West Entrance.  He said that he only entered because other people were entering as well.  Suleski claimed that did not see anyone fighting with the Capitol police until he was inside the building, and that when police told him to leave the building he did so immediately.  Suleski estimated he was inside the Capitol building for approximately two minutes.

During this interview with agents, Suleski also advised that he is a Federal Firearms Licensed ("FFL") dealer.  A review of law enforcement databases revealed that Suleski possesses an FFL through Obtuse Innovations LLC, which carries the same address as his residence.  Suleski is listed as member and manager of Obtuse Innovations on the FFL.

In a telephone follow-up interview on January 19, 2021, agents asked Suleski whether he had taken any mail or papers from the Capitol.  Suleski repeatedly denied taking anything from the building.  He acknowledged carrying a tan backpack with him inside the Capitol and claimed that at one point he retrieved his water bottle from the backpack, exposing the contents of the backpack.  According to Suleski, he could not think of anything he would have picked up or

touched that was not already in his possession before entering the Capitol building, nor could he

think of anything someone would have seen inside the backpack that would be concerning.

Agents asked if he still had the backpack.  When Suleski confirmed that he did, agents

requested that he open the backpack and examine its contents.  According to Suleski, he opened

the backpack and saw that it contained several loading slips from his job as a truck driver.  He

claimed that it was possible he moved some of the loading slips around to gain access to his water

bottle, and someone observing him may have thought he picked up paperwork in the Capitol.  The

agents asked Suleski to take a photograph of the contents of his backpack and text it to them. He

agreed to do so but never sent the photograph to the agents.

### Suleski's Post-arrest Interview and Additional Contact with the FBI

On March 8, 2021, an arrest warrant for Suleski was issued.  FBI Agents contacted him,

and he agreed to turn himself in on the warrant on March 10.  The agents instructed him to bring

his phone with him so that he could contact agents when he arrived.  Suleski did not bring his

phone when he surrendered.

Suleski agreed to a voluntary post-arrest interview with the FBI. During the interview, he

provided the same account of events as he did before.  He claimed that he did not know he was in

a restricted area, and he continued to deny that he had seen anyone fighting with the police before

he entered the building.  According to Suleski, the police were firing rubber bullets at the crowd

for no reason, which, in his opinion, is what started the violence between the officers and the

rioters. He again claimed that he was only in the building for two to three minutes and claimed

that he did not take any pictures or videos from the rally on his cell phone.  Finally, Suleski again

denied taking anything from the building.  When told that he was caught on surveillance video

taking the papers, Suleski continued to deny it and demanded to see the video footage.  Only when

confronted with the footage did Suleski admit that he had taken something but claimed he still did not remember doing so.

Because Suleski failed to bring his phone with him when he turned himself in, FBI agents obtained a warrant to seize and search his phone. When they arrived at his house, Suleski let them in and stated that he knew they would come for the phones since he did not bring it with him as instructed when he turned himself in. The agents asked where the phone was, and Suleski took them to an open gun safe containing several phones. They asked for the phone that he used at the Capitol, and he handed them one of the phones. Suleski then asked the agents whether or not they needed the SIM card too. When they said yes, Suleski went to a drawer and pulled out a SIM card and gave it to them. When the phone was processed the agents learned that it had not been used since 2019.

***The Charges and Plea Agreement***

On March 5, 2021, the United States charged Suleski by criminal complaint with violating 18 U.S.C. §§ 1512, 1752(a), 641, and 40 U.S.C. § 5104(e)(2). On March 10, 2021, law enforcement officers arrested him at the FBI Norfolk Field Office. On May 26, 2021, the United States charged Suleski by a five-count Indictment with violating 18 U.S.C. §§ 1512(c)(2), (2), 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On July 6, 2022, pursuant to a plea agreement, Suleski pleaded guilty to a Superseding Information, charging him with violations of 18 U.S.C. §§ 1752(a) and 641. By plea agreement, Suleski agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Suleski now faces a sentencing on one count of violating 18 U.S.C. § 1752(a)(1) and one count of violating 18 U.S.C. § 641. As noted by the plea agreement and the U.S. Probation Office,

Suleski faces up to six months of imprisonment and a fine of up to $5,000.  Suleski must also pay restitution under the terms of his or her plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the draft PSR.[8] According to the draft PSR, the U.S. Probation Office calculated Suleski's adjusted offense level under the Sentencing Guidelines as follows:

**Count One (Entering and Remaining in a Restricted Building and Grounds)**

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | 2 |
| Adjusted Offense Level | 6 |

**Count Two (Theft of Government Property)**

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B1.1(a)) | 6 |

**Grouping:**  According to the PSR, the counts do not group in this case.

---

[8]  The government's sentencing memorandum was due to the Court prior to the issuance of a final Presentence Investigation Report.  Accordingly, we rely on the Guidelines calculation in the draft report.

**Multiple Count Adjustment:**

| Group/Count | Adjusted Offense | Adjusted Offense |
|---|---|---|
| Count Group 1 | 6 | 1 |
| Count Group 2 | 6 | 1 |
| | Total Number of Units | 2 |

Greater of the Adjusted Offense Levels Above: 6

Increase in Offense Level (USSG §3D1.4.)                2

**Combined Adjusted Offense Level:**                8

**Acceptance of Responsibility:**                -2

**Total Offense Level:**                6

*See* Draft PSR (ECF No. 42) at ¶¶ 30-54.

The U.S. Probation Office calculated Suleski's criminal history as a category I.  ECF No. 42 at ¶62.  It calculated Suleski's total adjusted offense level, after acceptance of responsibility, at 6, and his corresponding Guidelines imprisonment range at zero to six months.  ECF No. 42 at ¶ 124.[9]

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying

---

[9]  The plea agreement noted that the counts did not group, but omitted the combined adjusted offense level analysis, which was properly calculated in the draft pre-sentence report.  Suleski's plea agreement, however, states that the "Estimated Offense Level" will be at least 4."  ECF No. 39 at p. 3.  Thus, the government notes that the draft PSR correctly calculated the offense level, but the Guidelines range remains the same under both the plea agreement and PSR.

with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the

January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration for a period of 90 days, 12 months of supervised release, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing

and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Suleski's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition.

Here, virtually all of those considerations support a sentence of 90 days of incarceration, as the government has recommended.  On January 6 and its aftermath, Suleski:

- entered the Capitol Building even after having been struck with tear gas and a rubber bullet;

- entered the building only 2 minutes after the breach of the Upper West Terrace door;

- took video on his mobile telephone of the confrontation between rioters and officers at the Rotunda doors;

- tried to enter locked rooms inside the Capitol where Congressional staffers may have been sheltering to avoid the howling mob of rioters;

- gave an inflammatory interview to a reporter immediately after leaving the Capitol;

- posted an inflammatory video on publicly available social media after the riot;

- repeatedly lied to FBI agents about the extent of his actions on January 6;

- as explained below, lied to the Probation Officer about going AWOL from the Army;

- tried to hide his phone that was the subject of a search warrant;

- as explained below, has some old, minor criminal history; and

- has not expressed remorse.

While these factors are not exhaustive, they help to place each defendant on a spectrum as to their fair and just punishment.  Had Suleski personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Suleski is therefore not a mitigating factor in misdemeanor cases.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B.  The History and Characteristics of Suleski**

As set forth in the draft PSR, while Suleski's criminal history score is zero, he has had several contacts with the criminal justice system, to include prior theft charges.  ECF No. 42 ¶¶ 55-62.  More concerning is Suleski's military history, for which he received a Bad Conduct discharge.  Reportedly, after his friend was killed during a drag racing incident in which Suleski participated, he went Absent Without Leave ("AWOL") from the U.S. Army for *seven years.* When asked about his military service by the PSR writer, Suleski attempted to lie about it, claiming that he had been active duty from 2007 until 2016.  This attempt to deceive the writer and this Court reflects an alarming lack of candor on Suleski's part and suggests that he may not appreciate the gravity of the instant case.

Further, in describing his experience in Syria to the PSR writer, Suleski attempted to paint his time there as if it was a sanctioned U.S. mission in which he served with valor and bravery, rather than what it appears to be: an opportunity to act as a legal mercenary.  As Suleski told the FBI in his post-arrest interview, using his own money, he traveled by himself to Iraq in 2015, notably while still AWOL from the U.S. Army, and then was smuggled into Syria, where he joined

a Syrian militia group to fight ISIS for "a couple of months."  He claimed that this Syrian militia group provided volunteers, including himself, with a uniform and a weapon, and then assigned volunteers to different areas of work including "sabotage, E.O.D., infantry, and sniper."  Suleski noted  to the FBI agents that he was supposed to go to a marksman unit but did not have a sufficient mastery of the language; he did not elaborate further as to which unit he was assigned.

According to Suleski, during his time in Syria, a bullet grazed his right ear, and he began to rethink his decision to fight ISIS, so he made arrangements to come back to the U.S.  Suleski reported that he suffered from PTSD as a result of what he saw in Syria, but that, at the time of this arrest, he was coping well.

On January 6, 2021, Suleski was also a Federal Firearms Licensed Dealer, a position that should come with a significant commitment to promoting responsible gun ownership.  Yet, in 2020, on at least one occasion, Suleski's social media suggested a penchant for violence when he posted a video of an assault rifle and a racially charged statement indicating his willingness to use it.



*Exhibit 14*

Despite his FFL status, Suleski was actually prohibited from owning any guns at the time of the insurrection because a Williamsburg Virginia Court had issued a protective order against him after a full hearing.  The order was in effect until February 6, 2021 and required Suleski to have no contact of any kind with the Petitioner.

This background, along with Suleski's conduct and commentary about the events of January 6, weigh strongly in favor of a significant period of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[10] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

---

[10]  Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by this Court during sentencing in *United States v. Paul Hodgkins*, 21-cr-188:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of this Court).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Suleski's actions and comments on January 6, 2021 and afterwards, including his lack of candor with the FBI and obstruction of the execution of a lawful search and seizure warrant for his cell phone, demonstrate the need for specific deterrence for this defendant.  Indeed, his attempts

to mislead the PSR writer about his military service suggest that he has yet to grasp the magnitude of his misconduct or the gravity of the events on January 6.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[11]  This Court must sentence Suleski based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.  Although those like Suleski convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  A probationary sentence should not be the default.[12]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

---

[11] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[12]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Suleski has pleaded guilty to the Superseding Information charging him with Entering and Remaining in a Restricted Building and Grounds and Theft of Government Property, in violation of 18 U.S.C. §§ 1752(a)(1) and 641.   These offenses are Class A misdemeanors.  18 U.S.C. § 3559.  Thus, sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," apply.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.  Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer

of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the January 6 cases of defendants Jeffrey Register, Mitchell Vukich, Nicholas Perretta, Boyd Campbell, and William Tryon provide a proper basis for the Court to satisfy its obligations under Section 3553(a)(6).

In *United States v. Register*, 21-cr-349 (TJK), the defendant, like Suleski, approached and breached the Capitol Building very shortly after the first wave of rioters; spent 30 minutes (a little more than Suleski) inside the building, and then more than another hour on Capitol grounds; destroyed evidence by factory resetting his phone; lied to the FBI during his initial interview, twice denying that he entered the Capitol; and has a modest criminal history.  Suleski did not engage in some of Register's aggravating conduct on January 6, to wit, that Register led other rioters while inside the Capitol; was inside the Crypt, National Statuary Hall, and then near the Speaker's Lobby; and ignored officers' attempts to remove him and others from the building.  On the other hand, Register was permitted to plead guilty to a single petty misdemeanor count, did not steal anything from the Capitol, did not give an inflammatory interview to a news media organization directly outside the Capitol, did not post an inflammatory video to social media, did not lie to Probation about his military service, and most significantly, did not attempt to enter locked offices inside the Capitol Building.  Judge Kelly sentenced Register to 75 days' incarceration.

In *United States v. Vukich and Perretta*, 21-cr-539 (TSC), the defendants pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D), a lesser charge than what Suleski is facing

here.  The government recommended, and Judge Chutkan sentenced the defendants to, 30 days of incarceration.  Like Suleski, Vukich and Perretta breached the U.S. Capitol after witnessing assaults on police; entered all the way to the third floor of the Capitol building where few other rioters ventured and where many staff offices are located; and stole paperwork that was on the floor from the same area of the same hallway as Suleski.  Vukich and Perretta also minimized their conduct when they spoke to the FBI.  Unlike Suleski, however, they did not lie about stealing the papers or obstruct law enforcement officials' attempts to lawfully seize their phones.  Neither did they give an interview to a global news organization extolling the violence against Congress or attempt to mislead the presentence report writer about their military background.  Most significantly, they did not attempt to enter locked offices inside the Capitol that might have been occupied by Congressional employees seeking refuge from the riot.  In light of these differences, a significantly longer period of incarceration for Suleski is appropriate.

Similarly, in *United States v. Camper*, 21-cr-325 (CKK), the defendant plead guilty to 40 U.S.C. § 5104(e)(2)(G), and for this class B misdemeanor received a sentence of two months of incarceration.  Like Suleski, Camper was former military, entered the U.S. Capitol despite seeing violence between rioters and officers, concealed evidence on his GoPro camera from law enforcement officials, and made statements to the media suggesting the possibility of future violence.  But again, and significantly, Camper did not attempt to open locked interior doors inside the Capitol.

In *United States v. William Tryon*, 21-cr-420, Judge Walton imposed a sentence of 50 days' incarceration.  Tryon, like Suleski, pleaded guilty to violating 18 U.S.C. § 1752(a)(1).  Tryon, like Suleski, was inside the U.S. Capitol Building for a short period of time (10 minutes); witnessed physical confrontations with police and property destruction; experienced chemical agents and

other crowd control measures like flash bangs before entering.  Admittedly, Tryon was in a much more chaotic part of the Capitol than Suleski and could hear shots fired and see a fire extinguisher going off nearby.  Tryon also had initially been barred from entry, only to try to re-enter via a different route.  On the other hand, there is no indication that Tryon tried to enter locked rooms inside the Capitol, lied to law enforcement officials, concealed evidence, or gave an interview to a global news organization.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Suleski to 90 days of incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by

imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  /s/ *Kimberley C. Nielsen*
Assistant United States Attorney
N.Y. Bar No. 4034138
601 D Street, N.W.
Washington, D.C. 20530
Phone: 202-252-7418
Email: Kimberley.Nielsen@usdoj.gov

## CERTIFICATE OF SERVICE

On this 3rd day of October, 2022,  a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/ Kimberley C. Nielsen
Assistant United States Attorney