UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | No.   21-cr-376 (RDM) |
| **Ryan Seth Suleski** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.

Quote from the Honorable Amit P. Mehta, *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg 29.

Mr. Suleski is a 35 year old man who has already suffered in many ways as a result of his conduct. He has not only suffered as result of collateral consequences he has experienced, he has also been enduring a tumultuous divorce with his wife – which has been further exacerbated because of this case. Mr. Suleski has had such a difficult time putting his life back together that he wishes to re-locate to Australia to have a fresh start. He has already taken steps to secure employment there. *See* Exhibit 1, Letter from Emerge Consultancy.

Despite the government's skewed and exaggerated claims, Mr. Suleski did not hide behind his actions. In fact, he spoke with the FBI *three* times prior to being appointed a lawyer and admitted to them that he went inside the Capitol building

1

on January 6, 2021. He also turned himself in on an arrest warrant in March of 2021. Lastly, he will meet with the government for a *fourth* time next week, before sentencing, pursuant to his plea agreement.

For the past year and a half, Mr. Suleski has been compliant with his pre-trial release conditions and has not only tried to pay his restitution in advance of sentencing, he tried to pay $2,000 which is more than the $500 he was required to pay pursuant to his plea agreement. *See* Exhibit 2, Restitution Payment Receipt. The finance department, however, refunded the money because they explained they cannot accept payment without an official order from the Court. Mr. Suleski will be ready to re-make the payment immediately after sentencing in this matter.

When looking at his specific conduct on January 6, 2021, and the rest of the 3553(a) factors, a lengthy period of incarceration as the government suggests is not warranted. Mr. Suleski acknowledges some of the aggravating factors in his case and respectfully requests that the Court consider a short period of incarceration with no term of supervision to follow. Undersigned counsel submits that Mr. Suleski has been more than specifically deterred, especially given the harsh collateral consequences he has experienced as a result of his conduct.

## BACKGROUND

On July 6, 2022, Mr. Suleski entered a guilty plea to one count of Entering and Remaining in a Restricted Building and Grounds, in violation of 18 USC §1752(a)(1), and Theft of Government Property, in violation of 18 USC §641 for his participation in the events on January 6, 2021. On that day, he attended the "Save

America" rally where he listened to several speeches encouraging the crowd to march to the Capitol to "stand up for this country and stand up for what is right.[1]" So Mr. Suleski, along with thousands of other individuals attending the rally, walked over to the Capitol building and entered inside. While inside, Mr. Suleski was not violent or aggressive towards officers.[2]

## ARGUMENT

### I. Legal Standard

The Court is well aware that the Supreme Court's opinions in *Kimbrough v. United States*, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), have dramatically altered the law of federal sentencing. Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a). Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range;

---

[1] *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

[2] The government tries to underscore this fact in its sentencing memorandum by claiming that had he been violent or aggressive, he would face more serious charges. *See* Gov't Memo at 25. However, this point is relevant for misdemeanor sentencings as the government forgets its prior charging decisions where there were misdemeanor defendants that allegedly displayed assaultive or aggressive behavior. 2 *See United States v. Jacob Wiedrich*, 21-CR-581 (TFH) (two months' home detention imposed as defendant was young, did well on pre-trial supervision, and had no criminal history); *United States v. Jordan Stotts*, 21-CR-272 (TJK) (court imposed two months' home detention despite Stotts allegedly shouting at police and scaling wall to gain access to Capitol). *See United States v. Bradley Rukstales*, 21-CR-041 (CJN) (defendant sentenced to 30 days' incarceration after government alleged he threw a chair in the direction of police officers who had been forced to retreat and was ultimately dragged out of building after resisting their efforts).

3

(d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. §3553(a).

## II. Imposing a Brief Period of Incarceration is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).

### a. Mr. Suleski's Personal History and Characteristics

Mr. Suleski was born in Massachusetts but grew up in Virginia after his parents divorced when he was only two years old. After this divorce, Mr. Suleski went to live with his father and grandfather in Williamsburg, Virginia. He was primarily raised by them as his mother struggled with mental illness for most of his life. Mr. Suleski was closest to his grandfather, who passed away in 2009.

When he was only 12 years old, his family sent him to military school after he was having some behavioral issues. Unfortunately, Mr. Suleski experienced significant trauma while he was there, which is described in more detail in the pre-sentence report. *See* PSR Par. 96, 97. Because of this incident, Mr. Suleski was permitted to return home to Williamsburg. He graduated from high school and a year later, Mr. Suleski enlisted in the Delayed Entry Program of the United States Army at the very young age of 18. He was then sent to Basic Training at the age of 19. Shortly thereafter, Mr. Suleski married his first wife – who he met in high school.

Still being a very young man just out of high school, Mr. Suleski was unfortunately involved in a tragic drag racing incident that resulted in one of his best friends being killed. Mr. Suleski was completely devastated and blamed himself for what happened. He was unable to handle this trauma, especially after receiving backlash from fellow soldiers. Unfortunately, Mr. Suleski left the military without permission as a result. During this time, he also went through a divorce with his wife of two years at this point. Notably, however, Mr. Suleski remained in Texas where he was stationed and worked in general laborer positions. He also obtained a professional truck driver's certification after enrolling in community college. A few years later, Mr. Suleski went on an unpaid mission to Syria to assist with the crisis there in 2015. Although this mission was not officially sanctioned by the US Military, Mr. Suleski went partly as a way to make amends for leaving the military. When he returned, he turned himself into the military where he was court-martialed and had to serve 90 days in a military jail facility.

Before he left for Syria and was court-martialed, Mr. Suleski married his second wife, who struggled with alcoholism and left him within one year – disappearing after Mr. Suleski made efforts to arrange marriage counseling for them to hopefully work through their issues. They divorced in 2011 and did not have any children together. Shortly thereafter, Mr. Suleski re-married his first wife, after re-connecting with her and desperately wanting to make things work and be a father to their daughter. They both moved to Virginia – where they have resided

ever since with their four additional children they had together. Unfortunately, the two continued to have serious issues in their marriage.

For the past 15 years, Mr. Suleski has supported and financially provided for his family, mostly as a truck driver working long hours and traveling constantly. Mr. Suleski's oldest son has autism and has required specialized classroom settings and therapy that has been very costly over the years. However, Mr. Suleski never hesitated to make sure he was making enough money to meet all of his needs and the needs of his other four children.

In the past year, Mr. Suleski and his wife have been separated and are going through an extremely challenging divorce as explained in more detail in the pre-sentence report. *See* PSR Par. 86. Since their separation, Mr. Suleski has actually been living out of his truck parked near the residence. Rather than obtaining his own place to live, Mr. Suleski's priority has still been to pay the household expenses to ensure that his family is taken care of. In the near future, it appears as though his ex-wife will move in with her mother along with their children.

### b.  Nature and Circumstances of the Offense

When Mr. Suleski decided to attend the rally in DC on January 6, 2021, he was not part of any organized group, did not engage in any pre-planning, and was completely alone. Wearing a t-shirt and a hooded jacket, with blue jeans and a backpack, Mr. Suleski attended the rally and heard Republican leaders, including Former President Trump, encourage the crowd to make their voices be heard so that an illegitimate President did not get elected. Former President Trump himself

encouraged the crowd to go down to the Capitol building and assured them that he would join them there.[3] Mr. Suleski did not know what to expect when he arrived at the Capitol building and originally thought it was just going to be a protest on the grounds. He had no prior intentions of entering the Capitol building without permission. Mr. Suleski was under the mistaken impression beforehand that it would be possible that people would be let in to the Capitol building the same way that the public observed some of the Supreme Court nomination proceedings. He did not realize that the certification vote was a completely different process and that the area and building was closed that day and not open to the public.

When he arrived on the grounds, he did notice confrontation with police and rioters and then realized that the public was not permitted to enter. Unfortunately, because of his curiosity, he proceeded to follow the crowd and entered into the Capitol building. It is important to note, however, that he did not experience any confrontations with police and when he entered the building, that entrance point had already been breached and so he was not met with resistance from law enforcement when entering. When speaking with the FBI after January 6, Mr. Suleski was forthcoming about the fact that he was shot with a stray rubber bullet and that he saw people trying to break in on the East Entrance – facts he was under no legal obligation to provide.

---

[3] According to testimony from the House of Representatives January 6th Committee, Former President Trump tried to go to the Capitol building after the rally but was re-directed by his security staff. What Donald Trump Limo Video on Jan. 6 Reveals (newsweek.com)

While inside the building, Mr. Suleski did not realize the gravity of his presence as he was walking through the halls of the Capitol building. He was aimlessly wandering through the building and only realized later how his presence, along with many others, created a terrifying experience for members of Congress and Capitol police officers. He also had no intentions of actually entering any offices, did not know whom the offices belonged to, and checked a couple doorknobs for no other reason but immaturity. Below is an excerpt of Mr. Suleski's letter of remorse to the Court where he explains:

> I come before you a humbled man. I say humbled because in the beginning I didn't see the severity of the situation I had put myself in. I was too focused on my own individual actions to see the chaos caused in the bigger picture. But lately I've had the time to revel in the matter. Hearing the concerns from the staff and congress in that building. Placing myself in the shoes of those facing an unknown outcome, like the riot police who faced an unnecessary amount of violent push from people who had no business acting the way they did. Although I did not participate in the violence, I still felt like I was part of a collective.

*See* Exhibit 3, Letter from Ryan Suleski. While Mr. Suleski wandered aimlessly around the building, he grabbed papers that he saw on the floor and took them with him. When he grabbed the papers, he did not even realize what they were and does not remember what was going through his head when he did it. Mr. Suleski did not do anything with those papers and later forgot that he even took them.[4] He left the building after about 15 minutes as soon as law enforcement instructed him to leave.

---

[4] The government tried to suggest in its sentencing submission that he lied about taking papers. However, he simply forgot that he did and when his memory was refreshed with video surveillance during his voluntary interview with the FBI, he acknowledged his actions.

8

Mr. Suleski did, in a moment of excitement, agree to speak to a BBC reporter. He also posted a video on Tik Tok when he drove home shortly after. *See* Gov't Memo at 16-17. Although Mr. Suleski opined on what had occurred that day, his words were a complete exaggeration and a thoughtless attempt to be a part of something he thought was important at the time. Mr. Suleski explains in his statement that:

> It's human nature to seek feeling belonged and embraced. Yet sometimes we are blinded by a desire to feel a part of something greater than ourselves, that we don't take the time to look at what we choose to involve ourselves with. Hindsight is 20/20 for a reason, because you can always look back on your decisions…Alas, they're still decisions that were made and can't be altered. But we learn from our decisions by embracing the consequences that come with them. After taking the last year and a half to observe how the actions of everyone like myself created something that can never be portrayed as good.

*See* Exhibit 3, Letter from Ryan Suleski. In fact, Mr. Suleski's actions before and after January 6, 2021, illustrate that he was not trying to be part of any "revolution" as his life is really focused on working and providing for his family.

Ever since January 6, 2021, Mr. Suleski has completely distanced himself from the events and has wanted nothing more than to move on with his life. He has been working long hours as a long haul truck driver and financially providing for his family. Unfortunately, he has experienced an alarming amount of collateral consequences in the last 15 months as a result of his misdemeanor criminal conduct. First, on June 9, 2021, Mr. Suleski received a letter from the Federal Aviation Administration (FAA) informing him that it was their decision to revoke his pilot's license as a result of this case because they concluded he is "suspected of posing, a risk of air piracy or terrorism, or a threat to airline or passenger safety."

*See* Exhibit 4, Letter from FAA. Despite Mr. Suleski's efforts to get his license reinstated, it remains revoked. This decision was solely based on the charges being filed in this case, none of which mention accusations of terrorism or violence. Mr. Suleski appealed this decision and has a hearing on October 18, 2022. Due to this recommendation by the FAA, Mr. Suleski also received a notification that his credentials allowing him to carry hazardous materials in his truck for employment was also revoked. Third, Mr. Suleski's bank recently closed his accounts that he has had with them for several years informing him that they reserve the right to close his accounts at any time without prior notice to the account holder.[5] In the midst of dealing with a divorce, Mr. Suleski met resistance from several entities that pre-judged him. Not only was it difficult for Mr. Suleski to respond to these collateral consequences, but he has also felt significant humiliation as a result.

Lastly, Mr. Suleski's divorce has been nothing but dramatic. His ex-wife has not missed an opportunity to use the instant case against him and it has also created significant tension with her family's feelings about Mr. Suleski. So much so, that Mr. Suleski had to obtain a restraining order against one of his in-laws. Mr. Suleski has been punished more than the Court could at this point. Thankfully, Mr. Suleski does have support from his close friends as described in their letters to the Court. *See* Exhibit 5, Letters of support. All describe him as a hardworking

---

[5] This has been a common trend amongst January 6 defendants, not only with bank accounts but also with various other types of services such as Lyft share ride application, and other various social media accounts.

10

individual who cares very much for his family and has "openly expressed remorse for his actions." *Id*.

## RESPONSE TO INACCURATE GOVERNMENT ACCUSATIONS

The government has made some incorrect and exaggerated claims in its sentencing submission. First, the government claims that Mr. Suleski "lied," and "misled" probation by not "coming clean" about his AWOL status in the military. *See* Gov't Memo at 24, 25. However, the government is not correct and was not present during the conversation. First, Mr. Suleski is the one who told the FBI on January 18, 2021, and on March 10, 2021, that he had a bad conduct discharge from the military because of his AWOL status in voluntary interviews with no lawyer present. Secondly, Mr. Suleski is also the one who alerted the probation officer during his pre-sentence interview that he left the military without permission. Contrary to the government's claim, he did not tell the probation officer that he was on "active duty" from 2007-2016. Rather, what he said was that he was "enlisted" during that time. *See* PSR Par. 103. As the conversation continued, Mr. Suleski clarified the same thing he volunteered twice before, and that is that he was AWOL status and later turned himself in.

Secondly, the government claims that Mr. Suleski was not truthful with the FBI during his *three* voluntary and lawyerless interviews following January 6, 2021. As an initial matter, Mr. Suleski was under absolutely no obligation to speak to law enforcement. The fact that he voluntarily did so on three separate occasions shows the opposite of what the government is trying to claim, and that is that Mr.

11

Suleski wants nothing else but to cooperate with law enforcement. There is a compelling reason why lawyers typically advise criminal defendants not to speak to law enforcement without a lawyer present because of the risk that statements will be taken out of context or that defendants will not remember the full extent of their conduct. That is exactly what happened here. Mr. Suleski was not prepared for those interviews and as a result, he did not divulge every single detail the way that the government now has the luxury of rehashing after months of investigating and studying this case. If Mr. Suleski wanted to intentionally deceive the FBI, he would not have admitted to being at the Capitol building and would not have told the FBI details about what occurred that day – all implicating him for criminal charges. He also would not have posted about his conduct on Tik Tok as he did just moments after leaving the Capitol building and then disclosed the existence of the video to the FBI.

The government has been quick to call out defendants for "minimization" or not being "forthcoming" in a setting where criminal defendants have an absolute right against self-incrimination, a constitutional amendment designed to protect due process rights during a government investigation. It is also during this time that suspects naturally want to defend their actions in the hopes that they will be treated leniently. Although Mr. Suleski agreed to speak to the FBI without a lawyer present, it is important to remember the risks and potential consequences of a defendant waiving their right against self-incrimination. The government is now trying to use Mr. Suleski's statements against him by cherry-picking bad

statements and leaving out the positive ones. Such an approach discourages criminal defendants from cooperating with the government out of fear that their statements will be taken out of context and used to hurt them in the future.

The government's motive for highlighting certain defendant statements in January 6 cases has been in the name of claiming "lack of remorse." The desire of a human being to naturally want to defend themselves when being interrogated is not an indication of lack of remorse and is more of an indication that a person hopes that the government will have mercy on them. Remorse also becomes stronger over time – after the initial desire to defend yourself subsides and a period of reflection begins. Mr. Suleski's remorse has been shown in many different ways, including the fact that he met with the FBI to incriminate himself when he did not have to do so, entered a guilty plea in this case, cooperated with the large amounts of responsibilities that come with being on pre-trial supervision, and sincerely expressed remorse to the Court.

Furthermore, the government's reckless attempt at painting Mr. Suleski as having a "penchant for violence" is inappropriate as it is not based on any evidence other than speculation over a photograph. *See* Gov't memo at 26-27. Not only did this photograph taken from his social media account have absolutely nothing to do with his conduct on January 6, 2021, it was also a photograph that was posted in June of 2020, long before the Capitol riots or the election. This post was just that, a post. There was never any indication that Mr. Suleski used that firearm or even possessed it during the limited time he was prohibited from doing so. This was a

13

photograph pulled from his social media account that the government is now attempting to use against him without any evidence that this firearm was in fact his firearm and not just simply a photograph of one. The fact remains that Mr. Suleski was not violent on January 6, 2021, and was not armed on that day.

Lastly, the government accuses Mr. Suleski of hiding a phone from the FBI. *See* Gov't Memo at 19. What is most notable is that Mr. Suleski actually led the FBI agents to an open safe containing several phones. Again, Mr. Suleski went above and beyond what is required from a suspect under investigation. Search warrants are typically executed without the assistance of the target of the investigation. In fact, the search warrant of his residence on March 9, 2021, resulted in the seizure of several electronic devices including a G-Pad tablet, a smart watch, a Samsung Galaxy S8, a silver Samsung, and an adapter with an SD card. It is also notable that at this point, Mr. Suleski had already publicly posted his activities on January 6, 2021 and incriminated himself while meeting with the FBI.

### c. The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

Based on Mr. Suleski's success on pre-trial supervision for the past year and a half, the Court can be assured that it is unlikely he will repeat the same conduct. As discussed at length above, Mr. Suleski has already been deterred after the harsh collateral consequences he has experienced as a result of his conduct.

A short period of incarceration followed by no supervision reflects the serious nature of his conduct but also reflects the fact that he has already served more than

a year of supervision. 90 days of incarceration as the government suggests would be excessive when looking at past similar cases. Although there are no cases that are identical, below are a few past sentences imposed in cases that have similarities to Mr. Suleski's case.[6]

- *US v. Michael Daughtry*, 21-cr-141 (RDM): Mr. Daughtry was sentenced to 36 months' probation with 60 days' home detention after also pleading guilty to 18 U.S.C. §1752(a)(1). The government also accused Mr. Daughtry of posting troubling statements and remaining on the Capitol grounds for hours, was shot with rubber bullets and observed others being sprayed with chemical irritants. Similar to Mr. Suleski, these statements were exaggerations of his actions that day and was compliant with all of his pre-trial release conditions.

- *US v. John Lolos,* 21-cr-243 (APM): Mr. Lolos was sentenced to 14 days' incarceration after entering a guilty plea to 40 U.S.C. §5104 (e)(2)(G). The government accused Mr. Lolos of making troubling statements and posts while in the Capitol building where he remained for 43 minutes. The government also alleged that after leaving the Capitol building, Mr. Lolos posted a video to twitter shouting "They left! We did it!" Unlike Mr. Suleski, the government also accused Mr.

---

[6] Although not sharing similar conduct to Mr. Suleski's case, *US v. Jeremey Grace*, 21-cr-492 (RDM), further demonstrates why a sentence of 90 days' incarceration in this matter would be excessive. In *Grace*, the court sentenced the defendant to 21 days' incarceration followed by 12 months' supervised release. The government alleged Mr. Grace was at the forefront of critical breaches, walked with the Proud Boys, and later tried to profit of the riots by selling various related paraphernalia.

Lolos of chanting at police officers while inside the Capitol and causing disruption on his plane ride back home –resulting in the plane having to turn around. Mr. Lolos also had some criminal history.

- *US v. Gracyn Courtright,* 21-cr-72 (CRC): Ms. Courtright was sentenced to 30 days' incarceration followed by 12 months' supervised release after pleading guilty to 18 U.S.C. §1752(a)(1). In her case, the Court rejected the government's excessive request for 6 months' incarceration. The government accused Ms. Courtright of picking up and carrying around a "Members Only" sign and briefly stepping onto the Senate floor while inside the building. The government also accused her of minimizing her conduct post January 6, 2021. Unlike Mr. Suleski, however, the government accused Ms. Courtright of chanting at a line of officers and posting many statements to twitter following January 6, 2021, showing a lack of remorse.

- *US v. Emily Hernandez,* 21-cr-747 (JEB); Ms. Hernandez was sentenced to 30 days' incarceration followed by 12 months' supervised release after entering a guilty plea to 18 U.S.C. §1752(a)(1). Although not identical, her alleged actions were similar to Mr. Suleski's actions as she allegedly gave an interview to a reporter while on the Capitol Grounds and took items from the Capitol building. Like Mr. Suleski, Ms. Hernandez turned herself in and cooperated with law enforcement early.

- *US v. Vukich and Peretta,* 21-cr-539 (TSC): Defendants sentenced to 30 days' incarceration after entering a guilty plea to 40 U.S.C. §5104 (e)(2)(G). The government mentions this case in its sentencing submission but tries to suggest that Mr. Suleski should receive worse punishment because of factors that are currently in dispute as discussed at length above. This case actually supports the argument that 90 days' incarceration for Mr. Suleski is excessive and would create an unwanted sentencing disparity. Vukish and Peretta were also accused of taking paperwork off the floor and walked through a lot of the same areas that Mr. Suleski did while in the Capitol building. These defendants were also have alleged to have made some unfortunate statements while in the building and afterwards. Like Mr. Suleski, these defendants also cooperated with law enforcement.

The cases that the government provide in support for its position that its recommendation of 90 days' incarceration in this case is warranted are not appropriate for comparison for the following reasons.

- *US v. William Tryon,* 21-cr-420 (RBW): Mr. Tryon was sentenced to 50 days' incarceration after pleading guilty to 18 U.S.C. §1752(a)(1). The government tries to suggest that Mr. Suleski should receive 40 days more jail time than Mr. Tryon. *See* Gov't Memo at 33-34. Notably, the government only requested 30 days' incarceration after alleging that Mr. Tryon was actually met with resistance from Capitol Police while

attempting to gain entry into the Capitol building. The government also accused him of refusing to comply with Capitol Police commands and was pepper-sprayed and hit by a baton by them. Mr. Tryon allegedly did not give up and eventually gained entry into the building. These alleged actions are not similar to Mr. Suleski's conduct as Mr. Suleski left the building as soon as an officer told him to leave and did not have confrontation with any of them.

- *US v. Jeffrey Register, 21-cr-349 (TJK):* Mr. Register was sentenced to 75 days' incarceration after entering a guilty plea to 40 U.S.C. §5104 (e)(2)(G). The government also tries to use this case to suggest that Mr. Suleski's actions were similar. *See* Gov't Memo at 32. However, the government accused Mr. Register of being on the Grounds and inside the Capitol building for 90 minutes, deliberately destroying evidence, and telling FBI that he never went inside the building. Mr. Suleski did not delete evidence off of his phone and he openly admitted to FBI on three separate occasions that he entered the Capitol building. Regardless of these differences, it is still not appropriate to use pre-charging conversations with law enforcement against a defendant at sentencing – especially when that individual is not represented by counsel. Notably, the government also accused Mr. Register of running past officers who were trying to contain a surge of rioters. The government further alleged that Mr. Register waved the crowd

towards an access point to the Speaker's Lobby and eventually witnessed the killing of Ashli Babbit. This case is not suitable for comparison to Mr. Suleski's case as the conduct was entirely different.

- *US v.* Camper, 21-cr-325 (CKK): Mr. Camper was sentenced to 60 days' incarceration and his alleged conduct was entirely unique from Mr. Suleski's case contrary to what the government suggests. *See* Gov't Memo at 33. Mr. Camper allegedly gave a television interview after exiting the Capitol building, saying his actions were justified because he was operating under the "insurrection act." The government also accused him of actually burying Go-Pro footage from January 6 in the ground. He also allegedly maintained to the FBI that he had done nothing wrong and believed he was in a "combat" state of mind while at the building. Unlike Mr. Camper, Mr. Suleski did not go to the Capitol building to potentially fight and has expressed remorse since January 6, 2021.

Lastly, general deterrence would be served by the recommended sentence. With the advancements in social media and particular media scrutiny surrounding the January 6 cases, the whole world has already seen the harsh collateral consequences that have resulted for similarly situated misdemeanants.

## **CONCLUSION**

For the reasons stated above, Mr. Suleski respectfully requests that the Court impose a brief period of incarceration with no supervision to follow. Mr. Suleski also requests that a fine not be imposed in light of the fact that he intends to pay $2,000 in restitution.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org